**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

ERICA MOORE, et al.

      Plaintiffs,

v.                                                                    Case No. 15-11252

OFFICER JOSEPH WEEKLY, et al.

      Defendants.

                                                   /

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Sometime after midnight on May 16, 2015, members of the Special Response Team of the Detroit Police Department used a battering ram and a "flash-bang" grenade to initiate a high-stakes raid of a duplex residence located at 4054/4056 Lillibridge in order to apprehend Chauncey Owens, suspect in a notorious murder. Local prosecutors charged that Owens, then 33, had shot and killed a 17-year-old boy because the teen had "disrespected" him.  The raid was successful in that Owens was apprehended (and later convicted of first-degree murder) but it also resulted in a tragedy: seven-year-old Aiyana Stanley-Jones ("Aiyana") was asleep on a front room couch in the lower unit, and died in the initial stages of the raid.

Plaintiffs Erica Moore and Dominika Stanley filed this complaint against Defendants, the City of Detroit, the Detroit Police Department, officer Joseph Weekly, and other unknown members of the Detroit Police Department Special Response Team, under 42 U.S.C. § 1983, alleging violations of the Fourth and Fourteenth Amendments to the United States Constitution.  Now before the court is Defendants' Motion for

Summary Judgment. (Dkt. # 19.) The court held a hearing on the matter on December 11, 2015. For the reasons stated below, and further on the record, Defendants' Motion for Summary Judgment will be granted in part and denied in part.

## I. BACKGROUND

In May 2015, Chauncey Owens was the prime suspect in an investigation of a heartless and grizzly murder that took place earlier that month. Using a photo lineup, two different witnesses identified Owens as the shooter. (Dkt. # 22-2, Pg. ID 232.) A series of tips indicated that Owens might be staying in a two-story duplex located at 4054/4056 Lillibridge, (Dkt # 22, Pg. ID 201.)

On May 15, Sergeant Anthony Potts of the Detroit Police Department was tasked with assembling a five-man team to perform surveillance of the duplex. (*Id.*) The officers watched the building in three unmarked cars, and confirmed that Owens' vehicle was parked outside. (*Id.*) Around 10:30 p.m., the suspect left the duplex on foot, and even made eye contact with one of the members of the surveillance team. (*Id.* at 202.) Nevertheless, due to various logistical issues (e.g., it was a "hot" street, with drug dealing and similar activities afoot), no officer was cleared to approach or try to detain him at that time. (*Id.*) Owens eventually re-entered the duplex. (*Id.*)

Meanwhile, members of a Special Response Team (SRT), including Defendant Officer Joseph Weekley, performed reconnaissance of the duplex in preparation for the forthcoming search warrant. (*Id.*) Homicide detectives delivered the warrant shortly after midnight and briefed the twenty-man team in the presence of a camera crew from the A&E program "The First 48." (*Id.* at 202-03.) During the briefing, the detectives notified the SRT that a family lived in the duplex. (*Id.* at 203.)

2

With the television crew following, the SRT arrived at the duplex and immediately arrested Mark Robinson, who was outside.  (*Id.*)   Officer Davis then threw a flashbang grenade through the front window into the living room of the downstairs residence.  (*Id.*)  At the same time, the SRT used a battering ram to knock down the front door and enter the building.  (*Id.*; Dkt. # 22-13, Pg. ID 320.)  The grenade exploded, and a second later as Officer Weekley was entering, his firearm discharged—just how is heavily contested—and the bullet struck Aiyana and eventually killed her.  (Dkt. # 22, Pg. ID 203; Dkt. # 22-13, Pg. ID 321.)

The SRT was trained to "dominate [the] room in a matter of seconds."  (Dkt. # 22, Pg. ID 203.)  According to the official police report, the SRT "detained" every occupant of the downstairs residence who was over the age of 14, including Aiyana's mother, father, and grandmother.  (Dkt. # 22-16, Pg. ID 349.)  The police found and arrested Owens in the upper unit of the duplex. (Dkt. # 22, Pg. ID 204.)

## II. STANDARD

### A. Summary Judgment

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "In deciding a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor."  *Sagan v. United States*, 342 F.3d 493, 497 (6th Cir. 2003).  The movant has the initial burden of showing the absence of a genuine dispute as to a material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "[T]hat burden may be discharged by showing . . . that there is an absence of evidence

to support the nonmoving party's case." *Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005) (internal quotation marks omitted).

The burden then shifts to the nonmovant, who must put forth enough evidence to show that there exists "a genuine issue for trial." *Horton v. Potter*, 369 F.3d 906, 909 (6th Cir. 2004) (citation omitted). Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 243 (1986).  In evaluating a summary judgment motion, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial . . . . [C]redibility judgments and weighing of the evidence are prohibited." *Moran v. Al Basit LLC*, 788 F.3d 201, 204 (6th Cir. 2015) (internal quotation marks and citations omitted).

## B. Section 1983

To prevail on a claim brought under 42 U.S.C § 1983, Plaintiffs must prove that Defendants acted "under color of law" and that their conduct deprived Plaintiff of a clearly established right, privilege, or immunity secured by the Constitution or the laws of the United States. *Markva v. Haveman*, 317 F.3d 547, 552 (6th Cir. 2003); *Toms v. Taft*, 338 F.3d 519, 524 (6th Cir. 2003)*; Ahlers v. Schebil,* 188 F.3d 365, 370 (6th Cir. 1999).

Where, as here, a defendant seeks qualified immunity, "a ruling on that issue should be made early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive." *Saucier v. Katz*,  533 U.S. 194, 200 (2001), *receded from on other grounds by Pearson v. Callahan*, 129 S.Ct. 808 (2009). "Qualified immunity is 'an entitlement not to stand trial or face the other burdens of

4

litigation.'" *Id.* (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).  Thus, the Supreme Court has repeatedly "stressed the importance of resolving immunity questions at the earliest possible stage in litigation.'" *Id.* at 201 (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam)).

### III. DISCUSSION

### A. Plaintiffs Moore and Stanley in their individual capacities

Plaintiffs Erica Moore and Dominika Stanley sue in their individual capacities for the "loss of love, society and companionship;" the "loss of services, gifts and/or gratuities;" and the "emotional distress" associated with the death of their cousin and daughter, Aiyana.  (Dkt. # 1, Pg. ID 2, 6.)  Defendants have moved to dismiss these portions of the complaint for failure to state a claim upon which relief can be granted. (Dkt. # 19, Pg. ID 58-59.)  While the mental stresses, pain, and suffering caused by the loss of a beloved child are undoubtably real, even poignant, Defendants are correct that family members of the deceased cannot maintain a § 1983 claim for personal injuries collateral to the injuries of the actual victim.  The Sixth Circuit explains:

> [A] section 1983 cause of action is entirely personal to the direct victim of the alleged constitutional tort.  Accordingly, only the purported victim or his estate's representative(s), may prosecute a section 1983 claim; conversely, no cause of action may lie under section 1983 for emotional distress, loss of a loved one, or any other consequent collateral injuries allegedly suffered personally by the victim's family members.

*Claybrook v. Birchwell,* 199 F.3d 350, 357 (6th Cir. 2000) (internal citations omitted).  As such, this court will grant Defendant's Motion with respect to the claims brought by Moore and Stanley in their individual capacities.

**B. Plaintiff Moore in her Capacity as Official Representative of Aiyana's Estate**
**1. Defendant Police Officers**
**a. § 1983 - Excessive Force and Unlawful Use of Deadly Force**

Plaintiff Erica Moore also appears in her capacity as official representative of the Estate of Aiyana Stanley-Jones. In this role, she sues Defendant police officers through 42 U.S.C. § 1983, alleging they subjected decedent to an "unreasonable seizure, excessive force, and the unlawful use of deadly force." (Dkt. # 1, Pg. ID 5.) Specifically, Moore asserts that the child's constitutional rights were violated when (1) Defendant officers executed the SRT raid on the residence; (2) Defendant officers threw a flashbang grenade through the front window of that residence; (3) Defendant Officer Weekley fired one or more rounds from his assault rifle in or into the residence; and (4) a bullet fired by Defendant Officer Weekly struck Aiyana in the head, fatally wounding her. (Dkt. # 22, Pg. ID 183.)

Defendants move for summary judgment alleging that Plaintiff has failed to provide sufficient evidence to support the allegations that (1) Aiyana was "seized" within the meaning of the Fourth Amendment (Dkt. # 19, Pg. ID 62); (2) that officers acted unreasonably (*Id.* at Pg. ID 61); (3) that Aiyana's substantive due process rights were violated; (4) that Aiyana was harmed by the flashbang (*Id.* at Pg. ID 59); and (5) that Officer Weekly fired random shots into the house from outside (*Id.*). Defendants also argue that they are entitled to summary judgment based on qualified immunity. (*Id.*) Each argument will be addressed in turn.

**i. Seizure**
**(A). The SRT Raid**

First, Defendants argue that "Aiyana's estate cannot successfully allege a violation of her Fourth Amendment rights to be free from unreasonable seizure,

6

because she was not the target of the police raid." (Dkt. # 19, Pg. ID 62.) As such, Defendants allege that "Plaintiffs' only ability to assert a valid section 1983 action would be for a violation of substantive due process rights" under the Fourteenth Amendment. (*Id.* at Pg. ID 63.)

"In determining whether to apply the Fourth or the Fourteenth Amendment to . . . [an] excessive force claim, the proper inquiry is whether the [plaintiff] was seized." *Ciminillo v. Streicher,* 434 F.3d 461, 465 (6th Cir. 2006) (citing *City of Sacramento v. Lewis,* 523 U.S. 833, 842-43 (1998)). A "person is seized only when, by means of physical force or a show of authority, his freedom of movement is restrained." *United States v. Mendenhall*, 446 U.S. 544, 553 (1980). This is an objective test: the question is "not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person." *California v. Hodari D.*, 499 U.S. 621, 628 (1991). When the subject of the alleged seizure is a minor, the question is whether a reasonable child of the plaintiff's same age and maturity would have "believed he was free to leave." *Doe v. Heck*, 327 F.3d 492, 510 (7th Cir.2003); *see also Jones v. Hunt*, 410 F.3d 1221, 1226 (10th Cir. 2005). If not, she is "seized" within the meaning of the Fourth Amendment.

Whether or not she was "targeted" by the police action seems directed to a subjective-motivation analysis of the officer, and as such unhelpful in answering this question. The Sixth Circuit has held, however, that the Fourth Amendment is not implicated in section 1983 claims "which seek remuneration for physical injuries *inadvertantently inflicted upon an innocent third party* by police officers' use of force while attempting to seize a perpetrator," *Claybrook v. Birchwell,* 199 F.3d 350, 359 (6th

Cir. 2000) (emphasis in original).  For example, in *Claybrook*, the Sixth Circuit found that

three plain-clothes police officers had not "seized" an innocent bystander when they

accidently shot her during a late night shoot out with an armed gunman. *Id.* at 359.

Unbeknownst to the officers, she had been sitting in the front seat of the car that the

gunman was hiding behind and was struck by a stray bullet. *Id.*

But *Claybrook* is inapplicable in the instant action.  There the officers were

aiming for—and shooting at—an individual person.  Accordingly, the object of their force

was an individual.  By contrast, here Plaintiffs have produced evidence to suggest that

the object of the officers' force was the entire duplex.  For example, Sergeant Potts

testified in his deposition that the goal of the raid was to "dominate that room in a matter

of seconds" and to "establish a foothold" in the building and "put *everybody* down."

(Dkt. # 22-4, Pg. ID 247 (emphasis added).)  Similarly, in an official police report written

just hours after the incident, Officer Foster reported that of the eleven residents living in

the duplex, nine were "DETAINED" and another—Aiyana—was killed.  (Dkt. # 22-16,

Pg. ID 349.)

In their reply, Defendants attempt to analogize this case with *Ewolski v. City of

Brunswick* where the Circuit found that innocent bystanders had not been seized even

though the police had taken "[c]ontrol over [their] environment."   (Dkt. # 25, Pg. ID 383

(citing *Ewolski v. City of Brunswick,* 287 F.3d 492, 507 (6th Cir. 2002))).  In *Ewolski*, the

police engaged in a two-day armed standoff with a mentally disturbed man who had

barricaded himself in his house and was holding his wife and son hostage.  *Ewolski*, 287

F.3d 492 (2002).  The Sixth Circuit held that while the man was "seized" when "the

police surrounded the house and paraded an armored vehicle in front of the . . . home,"

8

his wife and son were not.   *Id.* at 506.

But Defendants' analogy falls short.  *Ewolski* explains specifically that a seizure occurs whenever police "control somehow restricts the [bystander's] physical liberty." *Id.* at 507.  There, the man's wife and son were *not* seized because there "was no reason for either of them to believe that the police were preventing them from leaving the house." *Id.* After all, "it was the clear objective of the police to remove them from the house and remove them from the control of [their husband and father.]" *Id.* In other words, given the circumstances surrounding the siege, a reasonable person in the plaintiffs' shoes could not have thought that "the [officers'] words and actions" conveyed that "[they were] being ordered to restrict [their] movement." *Hodari D.*, 499 U.S. at 628. On the contrary, both the wife and son had spoken to the police about the hostage situation over the phone before the alleged seizure. *Ewolski,* 287 F.3d at 498-99.

Here, a team of heavily-armed officers waited until after midnight, burst through the front door using a battering-ram, and then "dominated" the front room "in a matter of seconds" and detained every adult in the house.  Unlike in *Ewolski,* there was no prior notification of the raid.  Viewing all this evidence in the light most favorable to the non-moving party, a jury could find that a person of tender years would have concluded that such conduct indicated that she was not free to leave.  The court cannot conclude that, as a matter of law, Aiyana was *not* seized during and as a consequence of the SRT raid.

### (B) The Flashbang Grenade

A "'flashbang" device (or "grenade") is not intended to injure, but only to "create a bright flash of light and a very loud noise." *United States v. Yarbrough,* 65 F. App'x 539,

541 n.1 (6th Cir. 2003) "[I]ts purpose is to stun and disorient any occupants of the premises to be searched." *Id.* Defendants seem to argue that "[f]lashbang devices do not" and presumably cannot, "seize" as a categorical rule. (Dkt. # 25, Pg. ID 382.) To the contrary of such an argument, (Dkt. # 25, Pg. ID 383), the Sixth Circuit has frequently analyzed the use of a flashbang device as a use-of-force seizure for Fourth Amendment purposes. *Jones v. Sandusky Cnty.,* 541 F. App'x 653, 661 (6th Cir. 2013) (citing *Ramage v. Louisville/Jefferson Cnty. Metro Gov't,* 520 F. App'x 341, 346-47 (6th Cir. 2013); *Bing ex rel. Bing v. City of Whitehall,* 456 F.3d 555, 569-70 (6th Cir. 2013); *Marmeishtein v. City of Southfield,* 421 F. App'x 596, 603 (6th Cir. 2011); *Graves v. Bowles*, 419 F. App'x 640, 643 (6th Cir. 2011); *United States v. Dawkins*, 83 F. App'x 48, 51 (6th Cir. 2003)). Indeed, in these cases the circuit devotes little time to the threshold question—it simply assumes that detonating a flashbang in the presence of the plaintiff constitutes a seizure—devoting the majority of its analysis to scrutinizing the reasonableness of the act given the surrounding circumstances. The pertinent inquiry is whether or not a particular display of force or show of authority restrained a particular person's freedom of movement. *United States v. Mendenhall*, 446 U.S. 544, 553 (1980). As observed above, a flashbang creates a bright flash of light and a noise in order to "to stun and disorient" occupants of the premises. *Yarbrough*, 65 F. App'x at 541.

A reasonable jury could certainly find that being stunned and disoriented restrains an individual's freedom of movement. The court cannot say that Aiyana, as a matter of law, was *not* seized as a consequence of the use of the grenade.

Defendants also argue that the officers' use of a flashbang device did not

10

constitute a Fourth Amendment seizure because it was employed "to prevent armed conflict" during the raid.  (Dkt. # 25, Pg. ID 383.)   An argument as to the purpose of a technique intentionally applied seems to the court, once again, as an appeal to subjective mentality, not objective reasonableness. It boils down to an assertion that Defendants' use of the device was not a seizure because it was reasonable, which conflates the issues.  As mentioned above, whether a person was seized is a threshold issue which determines whether an excessive force claim is analyzed under the Fourth Amendment's reasonableness standard or the Fourteenth Amendment's shock-the-conscience standard. Objective reasonableness remains ultimately a question for the jury. The court will deny this portion of Defendant's Motion for Summary Judgment.

### (C) The Discharged Shot

Third, Defendants argue that they are entitled to summary judgment on the issue of whether Aiyana was seized when Defendant Officer Weekley shot her, asserting that "there is no evidence to show that Officer Weekley intentionally fired his weapon."  (Dkt. # 25, Pg. ID 386.)  "While it is not always clear just when minimal police interference becomes a seizure, there can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." *Tennessee v. Garner,* 471 U.S. 1, 7 (1985) (internal citation omitted).  Nevertheless, the Supreme Court has noted that "a Fourth Amendment seizure does not occur whenever there is a governmentally caused termination of an individual's freedom of movement . . . , but only when there is a governmental termination of freedom of movement through means intentionally applied."  *Brower v. County of Inyo,* 489 U.S. 593, 596 (1989). Accordingly, the term "seizure cannot be applied to an unknowing act."  *Stewart v. City*

11

*of Middletown*, 136 F. App'x. 881 (6th Cir. 2005).  The Sixth Circuit has previously found

that this rule even applies to tragic situations such as when an bystander is killed by the

accidental discharge of an officer's firearm.  *Brown v. City of Louisville,* 33 F.3d 54 (6th

Cir. 1994).

Defendants argue that Officer Weekley could not have shot Aiyana intentionally

because he "was unaware of Aiyana's presence, because she (and her grandmother)

were on the couch, covered with a 'bunch of laundry and blankets.'" (Dkt. # 19, Pg. ID

65).  Plaintiffs, however, have presented evidence to suggest otherwise.  For example,

at his criminal trial, Officer Weekley stated the following:

> A.  As soon as the bang goes off I hear a haa [sic] coming from underneath what
> I thought was laundry.  So, now I'm like there is somebody hiding under here.
> So, as that is happening, Vincent Ellis is twisting to retreat back in the room, so I
> was on Ellis and then all of a sudden I hear this noise and I see him going back
> so I avert my attention to the blankets.
> Q. Did you point your weapon in the direction of the noise?
> A. Yes.
> Q. Was that a reasonable thing to do based on your training and experience?
> A. Yeah.  I couldn't just leave a person under there hiding.

Additionally, evidence has been presented that contradicts Officer Weekley's

assertion that Aiyana was covered.  Mertilla Jones ("Mertilla"), Aiyanna's grandmother

and a professed eyewitness to the incident, stated that at the time of the raid, her

granddaughter was sleeping, "her head . . . facing the door" resting "on the armrest of

the couch."  (Dkt. # 19-11, Pg. ID 138.) She was asked if she could see Aiyana on the

couch from her position lying on the floor, and said "Yes, I could." *Id.*  She said that "[a]s

soon as they came in, the gun was just pointed right there at Aiyana [sic] head.  He

pulled the trigger and I seen the light leave out of her eyes, her blood gushed out of her

mouth and she was dead."  (*Id.* at Pg. ID 137.)   Based on this testimony, a reasonable

jury could conclude that Aiyana was visible and that Officer Weekley discharged the weapon intentionally.  As such, the court will deny this aspect of Defendants' Motion for Summary Judgment.

### ii. Reasonableness

Even assuming that Aiyana was seized, Defendants argue they are nonetheless entitled to summary judgment because "it is clear the officers acted in a reasonable and rational manner, given the dangerous circumstances." (Dkt. # 19, Pg. ID 61.)  After all, "what the Constitution forbids is not all . . . seizures, but only unreasonable" ones. *Elkins v. United States,* 364 U.S. 206, 22 (1960).  "Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests."   *Graham v. Connor*, 490 U.S. 386, 396 (1989) (internal citations omitted).

> Because the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application, however, its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

*Id*. (citing *Bell v. Wolfish*, 441 U.S. 520, 559 (1979)).

Plaintiffs allege that the Defendant Officers' actions in (1) executing the SRT raid; (2) detonating a flashbang grenade in the residence; and (3) Officer Weekly discharging his weapon, fatally wounding Aiyana "were individually and collectively objectively unreasonable and an unconstitutional excessive use of force under the Fourth Amendment[.]" (Dkt. # 22, Pg. ID 188.) When, as here, "there are multiple instances of

13

force used, the usual procedure in this circuit is to 'carve up the incident into segments and judge each on its own terms to see if the officer was reasonable at each stage.'" *Jones v. Sandusky Cnty.,* 541 F. App'x. 653, 660 (6th Cir. 2013) (quoting *Dickerson v. McClellan*, 101 F.3d 1151, 1161 (6th Cir.1996)). "We generally analyze each use of force distinctly, as it is the reasonableness of the search or seizure that is important, not the reasonableness of the police's actions in creating the circumstances that led to the search or seizure." *Id.* at 660-61.  For the reasons stated below, the court will grant Defendants' Motion with respect to the SRT raid and the flashbang grenade but deny it with respect to the shooting.

### (A) The SRT Raid

The court is dubious about whether there is any articulated (or factually supported) theory in the Complaint alleging that the SRT raid, in and of itself, constituted an unreasonable use of force.  To the contrary, it appears that Plaintiffs first raised an argument to this effect in their Response.  But "[t]he bar against asserting new theories at the summary-judgment response stage is well established."  *Desparois v. Perrysburg Exempted Vill. Sch. Dist.,* 455 F. App'x 659, 667 (6th Cir. 2012); *see also Tucker v. Union of Needletrades, Indus. & Textile Employees,* 407 F.3d 784, 788 (6th Cir. 2005) ("A non-moving party plaintiff may not raise a new legal claim for the first time in response to the opposing party's summary judgment motion.") (quoting 10A Charles Alan Write, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2723 (3d ed. Supp. 2005)). Defendants did not have fair notice of such an argument , and thus did not address this claim in their Summary-Judgment Motion.  "It is only fair then that the Court decline to consider [it] in resolving the motion."  *Johnson v. Clafton,* No-

14

13-14922, 2015 WL 5729080, at * 3 (E.D. Mich. Sept. 30, 2015) (Michelson, J.).

Moreover, upon examination, the plan to enter the house, in and of itself, cannot be sustainably characterized as inappropriate. Plaintiffs acknowledge as much in their Complaint, where the warranted nature of the SRT activities are characterized as an effort to serve an arrest warrant (Complaint, at ¶ 8: "Detroit Police Department Special Response Team arrived . . . to serve an arrest warrant on a homicide suspect . . . ."). And, beyond the Complaint, it is now beyond dispute that there existed not only an arrest warrant, but also a search warrant authorizing entry into the house in pursuit of the intended arrest. (Dkt. # 19, Pg. ID 60; Dkt # 22, Pg. ID 202, 223; Dkt # 22-2, Pg. ID 236; Dkt. # 22-3, Pg. ID Pg. ID 241-42, 244; Dkt. # 22-4, Pg. ID 253, 257; Dkt # 22-7, Pg. ID 279; Dkt. # 22-8, Pg. ID 294; Dkt. # 22-16, Pg. ID 349; Dkt. # 22-17, Pg. ID 354.) This is not to say that every element of the SRT raid or every act performed in pursuit of the execution of the search warrant is therefore beyond challenge—quite the contrary—but only that the ability of officers to enter and try to arrest a dangerous man was based upon judicial review and authorization.  Entry into the residence, as such, does not constitute a violation of the Fourth Amendment.  Any stated or implied argument to the contrary proffered by Plaintiffs is therefore rejected.

### (B) The Flashbang Grenade

Defendants argue that even "[a]ssuming *arguendo* that the flashbang device 'seized' the occupants of the dwelling, use of the device was reasonable . . . ."  (Dkt. # 25, Pg. ID 384.)  The Sixth Circuit has held that "[t]he use of a flashbang is neither per se objectively reasonable nor unreasonable."  *United States v. Dawkins,* 83 F. App'x 48, 51, (6th Cir. 2003) (quoting *Kirk v. Watkins,* No. 98-7052, 1999 WL 381119, at *3 (10th

15

Cir. June 11, 1999)). "Instead, the reasonableness of the device's use . . . depends upon the facts and circumstances of each case." *Id.*

In the past, the circuit has found the use of flashbang grenades to be reasonable when the suspect was thought to be armed and dangerous. In *United States v. Dawkins,* the court noted that while

> the use of flash-bang devices will be inappropriate in many cases . . . where, as here, the officers had evidence that a violent felon possessed high powered weapons, it would strain credulity to find that the Fourth Amendment's reasonableness requirements precluded the officers from using a device intended to reduce the risks to all parties associated with entry.

*Id.* at 51. Plaintiffs have not presented any evidence to call into question the asserted dangerousness of the targeted suspect, Chauncey Owens. He was wanted for first degree murder—a crime he committed in broad daylight—and believed to be armed with an AK-47 and a revolver. (*See, e.g.* Dkt. # 19-3, Pg. ID 80.) He also had two dangerous pit bull dogs in the house. (Dkt. # 22-4, Pg. ID 250.)

The court finds, as a matter of law, that the officers' deployment of a flashbang grenade was reasonable and will therefore grant Defendant's Motion as to that device.

### (C) The Discharged Shot

Defendants have not argued that Officer Weekley acted reasonably when he discharged his weapon, instead arguing that he did not fire his weapon intentionally. But, having found that a reasonable jury could determine that Officer Weekley acted intentionally in discharging a shot upon entering the house, the jury could likewise find that such act was unreasonable.

### b. § 1983 - Substantive Due Process

In the event that the jury finds that Aiyana was not seized, Defendants move for

16

summary judgment on the issue of whether or not Defendants' actions violated Aiyana's substantive due process rights. Specifically, they argue Defendant Officers did not violate the Fourteenth Amendment by "(a) deploying a flashbang device or (b) blindly firing random shots into the lower duplex from outside" or (c) discharging the fatal shot. (Dkt. # 19, Pg. ID 65.) Because the court has already concluded that the Defendant officers' use of the flashbang grenade was reasonable and Plaintiffs have abandoned their allegations that shots were "blindly fired into the unit from outside" (see below), the court need only determine whether Officer Weekley's discharge infringed Aiyana's substantive due process rights.

"[T]he substantive component of the due process clause insulates citizens against the *arbitrary* exercise of governmental power." *Claybrook*, 199 F.3d at 359 (emphasis added). As such "only the most egregious official conduct"—that which "shocks the conscience"—can be said to be arbitrary in the constitutional sense." *Cnty. of Sacramento v. Lewis,* 523 U.S. 833, 846 (1998).

Nevertheless, courts have made clear that "the shocks the conscience standard is no calibrated yard stick" but rather "depends upon the facts and circumstances of the individual case." *Ewolski,* 287 F.3d at 510 (quoting *Lewis,* 523 U.S. at 847.) Conduct "that shocks in one environment may not be so patently egregious in another, and our concern with preserving the constitutional proportions of substantive due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience shocking." *Id.*

The analysis rises or falls on "whether the circumstances allowed the state actors

17

time to fully consider the potential consequences of their conduct." *Id.* (quoting

*Moreland v. Las Vegas Metro. Police Dep't.,* 159 F.3d 365, 3373 (9th Cir. 1998)).  As

the Sixth Circuit has stated:

> In situations wherein the implicated state, county, or municipal agent(s) are
> afforded a reasonable opportunity to deliberate various alternatives prior to
> electing a course of action (such as, for example, most occasions whereby
> corrections officials ignore an inmate's serious medical needs), their actions will
> be deemed conscience-shocking if they were taken with "deliberate indifference"
> towards the plaintiff's federally protected rights.  In contradistinction, in a rapidly
> evolving, fluid, and dangerous predicament which precludes the luxury of calm
> and reflective pre-response deliberation (such as, for example, a prison riot),
> public servants' reflexive actions "shock the conscience" only if they involved
> force employed "maliciously and sadistically for the very purpose of causing
> harm" rather than "in a good faith effort to maintain or restore discipline."

*Id.* (quoting *Lewis*, 523 U.S. at 852-53).

Defendants correctly assert that the court should apply the malicious and sadistic

standard because  "[o]nce the raid began, it involved a 'rapidly evolving, fluid and

dangerous predicament' as opposed to a situation where officers had a 'reasonable

opportunity to deliberate various alternatives prior to electing a course of action."[1]  (Dkt.

# 19, Pg. ID 64.)   However, they seek summary judgment on the grounds that "Officer

Weekley was unaware of Aiyana's presence" and as such his "actions—whatever their

cause—could not have been employed 'maliciously and sadistically for the very purpose

of causing harm' to Aiyana, when he lacked the ability to see her." (*Id.*)  As noted

above, Plaintiffs have furnished evidence which calls into question both Officer

---

[1] Defendants argue that because they are challenging the constitutionality of the
SRT raid itself, the court should analyze their Fourteenth Amendment claims under the
lower deliberate indifference standard.  (Dkt. Pg. ID 218-25.)  However, as noted above,
the court is unpersuaded that Plaintiffs have actually alleged that the SRT raid was
unconstitutional in and of itself.  As such, the court will reject this argument.

Weekley's knowledge of Aiyana's whereabouts and the intentionality of his actions. Viewing this evidence in the light most favorable to Plaintiffs, the court is not able to conclude as a matter of law that Officer Weekley did not act with malicious or sadistic intent. The court must deny this aspect of Defendants' Motion.

### c. Aiyana was not harmed by the flashbang

Defendants also argue that "Plaintiffs' Complaint grossly misstates the controlling facts regarding . . . whether the flashbang device caused Aiyana any injury." (Dkt. # 19, Pg. ID 60.) Specifically, Plaintiffs alleged that Officers had "burned" Aiyana when "[t]he flash-bang grenade struck [her]" and exploded. (Dkt. # 1, Pg. ID 3, 9, 15) But, Defendants note that "Aiyana's autopsy revealed no burns or injuries from the flashbang device, notwithstanding Plaintiffs' assertions. Further Aiyana's mother, Dominika Stanley, testified that she had no knowledge about Aiyana being burned by a flashbang device; the only person who told her that was an attorney." (Dkt. # 19, Pg. ID 60.)

Plaintiffs have not responded to this aspect of Defendants' Motion for Summary Judgment, and at oral argument they conceded that there was no evidence to support this factual allegation. The court will grant this aspect of Defendant's Motion.

### d. Shots were not fired outside the house

In the same vein, Defendants argue that Plaintiffs alleged facts with no support, specifically that "Police . . . blindly fired random shots into the lower duplex from outside." (Dkt. 1, Pg. ID 3.) However, Defendants assert that "all of the witnesses agree that shots were not fired blindly from outside the duplex; rather, a single round was discharged inside the lower unit." (Dkt. # 19, Pg. ID 65 (underline in the original).)

Plaintiffs have not responded to this argument. They admitted at the hearing that

there are simply no facts on which to support the complaint's allegation—a claim as reprehensively inflammatory as can be imagined—of police officers "blindly" shooting into the residence from outside. The court will grant Defendants' Motion for Summary Judgment with respect to this question as well.

### e. Qualified Immunity

Defendants next argue that the Defendant Officers are entitled to qualified immunity. (Dkt. # 25, Pg. ID 381.)  This is a question of law to be decided by the court. *Everson v. Leis*, 556 F.3d 484, 494 (6th Cir. 2009) (citations omitted).  Qualified immunity "involves a two-fold inquiry: First, '[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? . . . [T]he next, sequential step is to ask whether the right was clearly established.'" *Barber v. Overton*, 496 F.3d 449, 453 (6th Cir. 2007) (quoting *Saucier v. Katz*, 553 U.S. 194, 201 (2001)).  Under *Pearson v. Callahan*, a court may address either of these steps first.  555 U.S. 223, 236 (2009).  Plaintiffs bear the burden of showing the rights violated were clearly established, but Defendants bear the burden of demonstrating that "the challenged act was objectively reasonable in light of the law existing at the time." *Everson*, 556 F.3d at 494 (citations omitted).  As this issue is now before the court on Defendants' Motion for Summary Judgment, however, disputed facts and reasonable inferences must be considered in the light most favorable to Plaintiffs.

Defendants have not pled qualified immunity with respect to the intentional discharge of Officer Weekley's gun.  On the contrary, Defendants' qualified immunity argument focuses only upon Plaintiffs' claim in the Complaint that January 29, 2016,

20

(1) the grenade burned Aiyana and (2) officers shot "blindly" into the house from outside.  Both claims have been revealed as without substance and abandoned by Plaintiffs, as noted above. Accordingly, the court will deny this aspect of Defendant's Motion.

### f. § 1983 - Conspiracy

Plaintiffs also allege that Defendants "intentionally conspired to cover-up their unlawful acts by providing false and fictitious information to the authorities and to the media regarding the shooting of Aiyana[,]" specifically that "the bullet that killed her was fired from inside the lower unit of the duplex rather than from outside, and that the discharge of the firearm was the result of a physical struggle between Mertilla" and Defendant officers.  (Dkt. # 1, Pg. ID 8-9.)  Defendants argue that they are entitled to summary judgment on the following grounds:

> (1) The "allegations regarding where the fatal shot was fired are demonstrably false."  (Dkt. # 19, Pg. ID 68.)
>
> (2) "[T]he Complaint is flawed in that it fails to identify the 'two or more persons' who agreed on the conspiratorial objective." (*Id.*)
>
> (3) "[T]he pleading fails to state how the Defendants' supposed *ex post facto* 'cover up' injured Aiyana, when, according to the Complaint, she had already been injured by the time the conspiracy was hatched." (*Id.*)
>
> (4) Plaintiffs' conspiracy claims are unsupported, conclusory allegations that lack specificity.  (*Id.* at Pg. ID 68-69.)

The Sixth Circuit has outlined the standard for reviewing section 1983 conspiracy claims:

> A civil conspiracy is an agreement between two or more persons to injure another by unlawful action.  Express agreement among all the conspirators is not necessary to find the existence of a civil conspiracy.  Each conspirator need not have known all the details of the illegal plan or all of the participants involved.  All

21

> that must be shown is that there was a single plan, that the alleged coconspirator shared in the general conspiratorial objective, and that an overt act was committed in furtherance of the conspiracy that caused injury to the complainant.

*Spadafore v. Gardner,* 330 F.3d 849, 854 (6th Cir. 2003) (citing *Hooks v. Hooks,* 771 F.2d 935, 943-44 (6th Cir. 1985)).

While "circumstantial evidence may prove a conspiracy, it is well-settled that conspiracy claims must be pled with some degree of specificity and that vague and conclusory allegations unsupported by material facts will not be sufficient to state a claim under § 1983." *Heyne v. Metro. Nashville Pub. Schs.,* 655 F.3d 556, 563 (6th Cir. 2011) (internal quotations omitted).

Here, Defendants have correctly pointed to an absence of a genuine dispute of material fact on each of the asserted grounds. For example, with respect to the source of the fatal shot, Defendants have provided evidence, and Plaintiff now concurs, that "[a]ll of the witnesses who have testified about Officer Weekley's location when the shot was discharged stated that he was *inside* the lower duplex unit[,]" that "no witness has ever testified that officers fired shots from outside the unit into the room where Aiyana was located" and that the "videotape recording . . . does not show any such activitiy."

Plaintiffs have not responded to Defendant's arguments, nor provided evidence that call into question Defendants' assertions. As such, they have failed to satisfy their burden and, in fact, abandoned these conspiracy claims. The court will grant this aspect of Defendants Motion for Summary Judgment.

### 2. Defendant City of Detroit

Defendants also seek summary judgment on Plaintiffs' *Monell* claim against Defendant City of Detroit. (Dkt. # 19, Pg. ID 66.) Plaintiffs claim that the

22

> Detroit Police Special Response Team's improper and unconstitutional fatal
> actions in this situation were caused by the moving force of the City's
> unconstitutional training and policies and procedures which have lead to the
> establishment of a custom of allowing the City's police officers in general and the
> Detroit Police Department Special Response Team, in particular, to utilize
> excessive and unconstitutional force against members of the public.

(Dkt. # 1, Pg. ID 7-8.)  Under *Monell* and its progeny, a city may be held liable only

(1) "when execution of a government's policy or custom, whether made by its

lawmakers or by those whose edicts or acts may fairly be said to represent official

policy, inflicts the injury," *Monell*, 436 U.S. at 694, and (2) when there is an "affirmative

link between the policy and the particular constitutional violation alleged," *Oklahoma

City v. Tuttle*, 471 U.S. 808, 823(1985); *see also Petty v. Cnty. of Franklin,* 478 F.3d

341, 347 (6th Cir. 2007).  Plaintiffs must establish that Detroit's official policies or

customs (or lack thereof) were a "moving force" behind the deprivation of Plaintiffs'

rights and arose as a result of "deliberate indifference" to her rights.  *See Doe v.

Claiborne Cnty.*, 103 F.3d 495, 508 (6th Cir. 1996).

"[I]n order to impose municipal liability a plaintiff bringing a § 1983 claim against a

municipality must therefore identify the policy or custom that caused her injury."  *Ford v.

Cnty. of Grand Traverse,* 535 F.3d 483, 495 (6th Cir. 2008).  "Locating a 'policy' ensures

that a municipality is held liable only for those deprivations resulting from the decisions

of its duly constituted legislative body or of those officials whose acts may fairly be said

to be those of the municipality."  *Id.* (quoting *Bd. of Cnty. Comm'rs v. Brown,* 520 U.S.

397, 403-04 (1997)).  Once the policy is identified, "a plaintiff must show that the

municipal action was taken with the requisite degree of culpability and must

demonstrate a direct causal link between the municipal action and the deprivation of

23

federal rights." *Bd. of County Comm'rs,* 520 U.S. at 403-04.  As the Sixth Circuit has

phrased it,

> The key inquiry thus becomes whether, in viewing the [municipality]'s
> policy in the light most favorable to [Plaintiff], there was sufficient evidence
> for reasonable minds to find "a direct causal link" between the County's
> policy and the alleged denial of [Plaintiff's] right . . . . *See, e.g., Blackmore
> v. Kalamazoo County*, 390 F.3d 890, 900 (6th Cir. 2004) ("A municipality
> can be liable under 42 U.S.C. § 1983 only if the plaintiff can demonstrate
> that his civil rights have been violated as a direct result of that
> municipality's policy or custom.") (citing *Monell*, 436 U.S. at 694, 98 S.Ct.
> 2018; *Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1993)
> ("[T]o satisfy the *Monell* requirements[,] a plaintiff must identify the policy,
> connect the policy to the city itself and show that the particular injury was
> incurred because of the execution of that policy." (internal quotation marks
> omitted)).

*Ford,* 535 F.3d at 497 (6th Cir. 2008).

With respect to Plaintiffs' *Monell* claim, Defendants seek summary judgment on

two different grounds, namely that (a) Aiyana's constitutional rights were not violated

and (b) Plaintiffs fail to state with specificity any city policy, action, or omission that

could have lead to Aiyana's death.

First, Defendants assert that "Plaintiffs cannot prove the prerequisite to their

recovery under *Monell*—that the DPD and the city's agents violated Aiyana's

constitutional rights."  (Dkt. # 19, Pg. ID 67-68.)  Having already decided that Plaintiffs'

produced sufficient evidence to survive summary judgment concerning Aiyana's

constitutional claims, this argument fails.

Defendants' second argument is that "the Complaint does not specify what

actions or omissions attributable to the City and the DPD could have produced the

foreseeable result." (*Id.* at Pg. ID 66.)

Plaintiffs' Complaint contains nothing more than a bare-bones recitation of the

*Monell* test, containing no "facts from which the Court could conclude that it is plausible that the Municipal Defendants maintain a custom, policy, and/or practice that resulted in the alleged violation of Plaintiff's constitutional rights . . . ." *Jackson v. City of Highland Park,* No. 15-10678, 2015 WL 3409013 (E.D. Mich. May 27, 2015). As another judge of this district has explained, "Plaintiff cannot allege a municipal liability claim hoping that discovery will reveal facts to support the claim. A lawsuit is not a fishing expedition for a plaintiff to discover a claim against the defendant." *Curney v. City of Highland Park,* No. 11-12083, 2012 WL 1079473, at *5 (E.D. Mich. March 30, 2012) (Duggan, J.). Plaintiffs' *Monell* claim could not survive a simple motion to dismiss, and with nothing more provided in response than an argument that Defendant' motion is "woefully premature,"[2] neither can it survive the instant motion for summary judgment. *Yaldo v. Homeward Residential, Inc.*, No. 14-2593, 2015 WL 4636627 (6th Cir. Aug. 4, 2015).

The court will grant this aspect of Defendants' Motion.

## IV. CONCLUSION

IT IS ORDERED that Defendants' Motion for Summary Judgment (Dkt. # 19) is

1.   GRANTED with respect to all claims brought by Plaintiffs Moore and Stanley in their individual capacities;

2.   GRANTED with respect to the allegation of injuries caused to Aiyana by the

---

[2] The court acknowledges Plaintiff's counsel's affidavit filed under Fed. R. Civ. P. 56(d), alleging that discovery is ongoing and that testimony may reveal things about the frequency of SRT raids, the timing thereof and the presence of a TV crew. None of these points, however, bear upon Defendants' *Monell* argument that there exists no identified City of Detroit custom, policy, or practice that resulted in the alleged violation of a person's constitutional rights. The court observes further that in the five months from the filing of the 56(d) affidavit until oral argument, neither on the docket nor in the course of argument was any additional evidence proffered or referred to as supporting this, or any other, portion of Plaintiffs' Complaint.

flashbang device;

3.      GRANTED with respect to the allegation of officers shooting into the duplex from the outside;

4.      GRANTED with respect to Plaintiffs' § 1983 conspiracy claim in its entirety;

5.      GRANTED with respect to Plaintiff's *Monell* municipal liability claim;

6.      DENIED with respect to Plaintiffs' claim of unconstitutional seizure and the use of unconstitutionally excessive force relative to Plaintiff's allegation that in the course of entering the residence, Officer Weekley intentionally aimed and discharged a firearm at Aiyana Stanley-Jones resulting in her death.

                                        s/Robert H. Cleland
                                        ROBERT H. CLELAND
                                        UNITED STATES DISTRICT JUDGE

Dated:  February 1, 2016

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, February 1, 2016, by electronic and/or ordinary mail.

                                        s/Lisa Wagner
                                        Case Manager and Deputy Clerk
                                        (313) 234-5522

S:\Cleland\JUDGE'S DESK\C1 ORDERS\15-11252.WEEKLY.SJ.JAH.RHC1.wpd